[No. 63199-9.   En Banc.   February 1, 1996.]

WHATCOM COUNTY, *Respondent*, v. THE CITY OF BELLINGHAM, *Appellant*.

538

*Bruce Disend, City Attorney,* and *Dawn Sturwold, Assistant*; and *Foster Pepper & Shefelman,* by *P. Stephen DiJulio,* for appellant.

*David S. McEachran, Prosecuting Attorney,* for respondent.

*Christine O. Gregoire, Attorney General,* and *Joseph E. Shorin III, Assistant,* for the State.

TALMADGE, J. — The City of Bellingham (City) appeals from a partial summary judgment requiring it to arbitrate the amount it must reimburse Whatcom County (County) for certain costs which were shifted to the County after the City's 1980 repeal of the vast majority of Title 10 of the Bellingham Municipal Code, the portion of its municipal code which defined crimes.

RCW 3.50.800 forbids cities which have enacted a municipal criminal code and enforced such a criminal code in their municipal courts from repealing such code "in its entirety" prior to July 1, 1984, so as to impose additional criminal justice system costs on county government. We find that the City's actions here constituted a de facto repeal of "that portion of its municipal code defining crimes" for purposes of RCW 3.50.800, and we affirm the decision of the trial court.

ISSUES

1. For purposes of RCW 3.50.800, which requires arbitration between a city and a county where, prior to July 1, 1984, the city repeals "in its entirety that portion

of its municipal code defining crimes," is the statute satisfied by a "de facto" repeal?

2. Did the City offer sufficient evidence to raise a genuine issue of material fact whether its actions constituted a de facto repeal prior to July 1, 1984, of "that portion of its municipal code defining crimes" where the City repealed all but a few crimes in Title 10 of its municipal code, presented no evidence of prosecution between 1981 and July 1, 1984 of its few remaining Title 10 crimes, and closed its jail?

## FACTS

In August 1980, Bellingham's Mayor told the City Council the City could no longer afford a jail system. He proposed that the City transfer the jail and court system (except for minor cases in which jail sentences were not involved) to the County. Accordingly, the Council's Public Safety Committee recommended the transfer of the city jail and court system to the County, except for minor offenses involving fines. The County's district court was informed that the transfer would occur in January 1981.[1] The Mayor also requested that arrangements be made for the County to house "any future Municipal prisoners . . . should the rare occasion arise when under some little-used section of the Municipal Code, this becomes necessary." Clerk's Papers at 102. The Mayor told the City Attorney and Police Department to draft ordinances "repealing those sections of the Municipal Code which currently include jailable offenses." Clerk's Papers at 103. The ordinances were drafted and introduced.

In December 1980 hearings on the ordinances, the City Attorney testified before the City Council Public Safety Committee that the proposed ordinances would repeal

---

[1]The City estimated 1,091 cases would be shifted to the Whatcom County District Court in the first year. Clerk's Papers at 105. The district court caseload allegedly grew from 1,751 in 1980 to 4,592 in 1981. Clerk's Papers at 379. Clearly, the fiscal impact of the shift is substantial. The County alleged a fiscal impact of $766,904 in 1991 for the increased caseload. Clerk's Papers at 381.

almost all offenses which carried jail penalties, delete jail penalties for violations of the vehicle code, and exclude jail as a penalty for misdemeanors generally. He noted a few remaining offenses which carried jail time would remain in force, but would not be a problem, because violations were "rare." Clerk's Papers at 107-09.

The ordinances were passed and made effective January 1, 1981. Ordinance 8919 repealed most traffic violations, such as DWI, driving while suspended, and reckless driving. Ordinance 8920 altered the definition of misdemeanor to generally exclude jail as a penalty, and repealed nearly all crimes in Title 10 of the Bellingham Municipal Code, the Title which defined crimes, including those dealing with theft, stolen property, bad checks, altering vehicle identification numbers, injury to property, burglar tools, trespass, vehicle prowling, public morals, false reporting, disrupting schools, breach of the peace, fighting, drinking in public, sales of liquor to intoxicated persons, offenses by or against public officers, firearms and weapons offenses, and curfew. Prior to July 1, 1984, a few crimes remained in Title 10 of the Bellingham Municipal Code, including shoplifting, driving on public lawns, litter, nuisance, and marijuana possession.[2]

As the City acknowledged below:

> The City made a conscious policy decision that duplication of the State's efforts at criminal enforcement was not in the public interest, and chose to only proscribe and enforce those criminal sanctions that were not already reflected under State law.

---

[2] Two crimes that carried jail as a penalty (lewd conduct and disorderly conduct) were added to Title 10 in 1983. Ordinance 9219, enacted June 24, 1983. Clerk's Papers at 297-99. In addition, the City claims that after 1980, it also retained "solid waste" offenses carrying jail as a penalty, citing Ordinance 8293, enacted in 1974. Clerk's Papers at 282-87. However, these provisions were codified in Title 9 (Health and Sanitation), ch. 12 (Garbage Collection), see BMC 9.12.010-.080 rather than in Title 10 (Crimes).

In municipal criminal codes, criminal offenses may be found both in the portion defining crimes and in other titles. Given that RCW 3.50.800 refers specifically to a repeal of only the portion of a municipal code defining crimes, the City's continued enforcement of offenses other than those defined in Title 10 would not be relevant to this case.

Clerk's Papers at 80.

After January 1, 1981, the City closed its jail and instructed its law enforcement officers to charge offenders under state law. The County tried to collect fees for the incarceration of prisoners who were charged under state law by City officers. The City placed fees into a fund under protest, and sued the County, seeking declaratory and injunctive relief. The suit was dismissed on January 14, 1982, with an agreement that the City would not be obligated to pay the County for processing of City prisoners under state law and attendant jail services "unless state laws are amended to impose such obligation upon cities or the State Supreme Court rules" that a county could collect such costs. Clerk's Papers at 347-50. The County kept all payments made by the City for such costs and agreed that the retained fees "shall constitute full and complete payment for any costs or damages suffered by the County on account of the City's closure of its jail and repeal of certain jailable offenses." *Id.* The agreement also provided that in the future, the City would compensate the County for accepting any "City misdemeanants." *Id.*

In 1984, the Legislature enacted the Court Improvement Act (the Act) whose pertinent provisions prohibit municipalities from repealing that portion of their municipal codes defining crimes or terminating their municipal courts without making provision for the fiscal impact of such actions with the affected counties. The Act applied to a repeal occurring prior to July 1, 1984, but required a city to reimburse a county for only post-January 1, 1985 costs. Laws of 1984, ch. 258, § 202; RCW 3.50.800.

On May 26, 1992, the City amended its general definition of misdemeanor, reinstating jail time as a penalty for committing a misdemeanor.

In October 1993, the County filed this declaratory judgment action seeking to compel arbitration under the Act for the fiscal implications of the City's actions in 1980-81 with respect to the City criminal code and shift of criminal justice costs to the County. The City moved, and the

County cross-moved, for summary judgment. The City argued RCW 3.50.800 required a city to repeal its criminal code "in its entirety" before an obligation to share in the costs of law enforcement could arise. It contended that keeping "one simple little statute" on the books would allow a city to escape the mandate of the statute. Supplemental Clerk's Papers at 34-35. The County contended, under the definition set forth in RCW 9A.04.040, offenses without jail time as a penalty were not crimes. Alternatively, the County argued that the City had de facto repealed all of its municipal criminal code.

Noting that the objective of RCW 3.50.800 was to prevent a city from keeping profitable traffic business while "dumping the loss end" (jury trials in criminal cases) on the counties, the trial court ruled that "if the city in effect, bows out of the criminal business," the statute would apply. Supplemental Clerk's Papers at 39. The trial court specifically referenced the City's in-court admission that the City had not prosecuted or jailed anyone since 1981 under the handful of crimes that were kept on the books:

> [T]here should not be a triumph here of form over substance and that is what it would be, an escape through a loophole that makes no sense at all. A loophole created by this handful of statutes that mean nothing. They are not prosecuted. They are not jailed. Bellingham has no jail, doesn't own a jail, and so should these little ordinances sit there to defeat this statute? I think not.

*Id.* The trial court denied the City's motion, granted the County's cross-motion for summary judgment, and ordered arbitration.

The City moved for reconsideration, alleging it had continued to prosecute and incarcerate persons for certain misdemeanors under City ordinances after 1980. The City provided evidence of its payments to the County from 1984-94 for the cost of jailing certain prisoners referred by the City. The County claimed the incarcerations arose out of civil infractions only (failure to comply with court orders, pay fines, or appear), rather than the crimes in the City's municipal criminal code.

The trial court denied the motion for reconsideration and entered a partial summary judgment with CR 54(b) findings.[3] The City appealed to Division One of the Court of Appeals, and the appeal was certified to this court pursuant to RCW 2.06.030. We accepted certification.

## ANALYSIS

### A. Construction of RCW 3.50.800

As the City properly notes, counties are generally responsible for costs of administering criminal laws within their boundaries. *State v. Agren*, 32 Wn. App. 827, 828, 650 P.2d 238, 660 P.2d 1145 (1982). It is equally true, however, that cities historically assumed responsibility for criminal justice activities by enacting municipal criminal codes, employing city attorneys to prosecute the crimes created by such codes, creating municipal courts, and erecting city jails, as did the City of Bellingham here. *See* RCW 3.46, 3.50, and 35.22.280(35) (authority to try and punish crimes). If cities precipitously abandoned a role they had undertaken for criminal justice activities, a significant cost would be imposed upon counties, which would be obliged to assume such criminal justice costs.

The 1984 Court Improvement Act regulated interlocal conflicts over such shifts in criminal justice system costs. RCW 3.50.800 provides as follows with respect to actions by cities *prior* to July 1, 1984:

> (1) If a municipality has, prior to July 1, 1984, repealed in its entirety that portion of its municipal code defining crimes but continues to hear and determine traffic infraction cases under chapter 46.63 RCW in a municipal court, the municipality and the appropriate county shall, prior to January 1, 1985, enter into an agreement under chapter 39.34 RCW under which the county is to be paid a reasonable amount for costs incurred after January 1, 1985, associated with prosecution,

---

[3]The City's third-party claim against the State under RCW 43.135.060 remains pending. The State did not participate in the summary judgment proceedings.

adjudication, and sentencing in criminal cases filed in district court as a result of the repeal. If the municipality and the county cannot come to an agreement within the time prescribed by this section, they shall be deemed to have entered into an agreement to submit the issue to arbitration pursuant to chapter 7.04 RCW. The municipality and the county have the same rights and are subject to the same duties as other parties who have agreed to submit to arbitration under chapter 7.04 RCW.

(2) The agreement . . . shall include provisions for periodic review and renewal of the terms of the agreement. If the municipality and the county are unable to agree on the terms for renewal of the agreement, they shall be deemed to have entered into an agreement to submit the issue to arbitration under chapter 7.04 RCW. Pending conclusion of the arbitration proceeding, the terms of the agreement shall remain in effect. The municipality and the county have the same rights as other parties who have agreed to submit to arbitration under chapter 7.04 RCW.

The 1984 Legislature enacted analogous restrictions on efforts by cities to repeal their municipal criminal codes *after* July 1, 1984. RCW 35.20.010; RCW 35.22.425; RCW 35.23.595, repealed by Laws of 1994, ch. 81, § 89; RCW 35.24.455, recodified as RCW 35.23.555 by Laws of 1994, ch. 81, § 90; RCW 35.27.515; RCW 35.30.100; and RCW 35A.11.200. RCW 3.50.805 imposes similar obligations upon a municipality where there is a termination of its municipal court before July 1, 1984.

The approach in RCW 3.50.800 is similar to that taken in other circumstances of potential interlocal conflict over costs. We have upheld the legislative direction to compel arbitration of the fiscal impact of public health costs where a city and county could not agree. RCW 70.05.145; *City of Auburn v. King County*, 114 Wn.2d 447, 452-53, 788 P.2d 534 (1990).

Thus, the Legislature in 1984 evidenced a strong policy to prevent cities from freely imposing the costs of their criminal justice activities on counties by repealing munic-

ipal criminal codes or terminating their municipal courts. The Legislature did not forbid cities from abandoning a role in the criminal justice system, but it did require an agreement on the handling of the fiscal impact of such an action between the city and affected county government.

In interpreting a statute, we do not construe a statute that is unambiguous. *Food Servs. of Am. v. Royal Heights, Inc.*, 123 Wn.2d 779, 784-85, 871 P.2d 590 (1994). If the statute is ambiguous, the courts must construe the statute so as to effectuate the legislative intent. In so doing, we avoid a literal reading if it would result in unlikely, absurd or strained consequences. *State v. Elgin*, 118 Wn.2d 551, 555, 825 P.2d 314 (1992). The purpose of an enactment should prevail over express but inept wording. *Id.; State ex rel. Royal v. Board of Yakima County Comm'rs*, 123 Wn.2d 451, 462, 869 P.2d 56 (1994). The court must give effect to legislative intent determined "within the context of the entire statute." *Elgin*, 118 Wn.2d at 556; *State ex rel. Royal*, 123 Wn.2d at 459. Statutes must be interpreted and construed so that all the language used is given effect, with no portion rendered meaningless or superfluous. *Stone v. Chelan County Sheriff's Dep't*, 110 Wn.2d 806, 810, 756 P.2d 736 (1988); *Tommy P. v. Board of County Comm'rs*, 97 Wn.2d 385, 391, 645 P.2d 697 (1982). The meaning of a particular word in a statute "is not gleaned from that word alone, because our purpose is to ascertain legislative intent of the statute as a whole." *State v. Krall*, 125 Wn.2d 146, 148, 881 P.2d 1040 (1994).

The City contends the language of RCW 3.50.800 is unambiguous, and argues that because it left a few scattered crimes on its books, it never repealed the entirety of its criminal laws. Under the ordinary and usual meaning of the word, it was not, therefore, affected by the statute. *Department of Ecology v. Public Util. Dist. 1*, 121 Wn.2d 179, 189, 849 P.2d 646 (1993), *aff'd*, 511 U.S. 700, 114 S. Ct. 1900, 128 L. Ed. 2d 716 (1994); *Erection Co. v. Department of Labor & Indus.*, 121 Wn.2d 513, 518, 852 P.2d 288 (1993).

The City also contends that certain legislative actions support its construction of RCW 3.50.800. A legislative committee in 1994 failed to act on HB 2594, 53rd Leg., Reg. Sess., which would have caused cities to bear greater costs for misdemeanor and felony cases charged by city police. The Legislature also declined to enact SSB 5329, 54th Leg., Reg. Sess., in 1995, which would have amended RCW 70.48.400 to make the cost of prosecuting felons the responsibility of a county, and the cost of prosecuting misdemeanants the responsibility of the city or county that charged the person. From this legislative inaction, the City derives a legislative policy disfavoring the shifting of criminal justice costs to cities.

The County argues that RCW 3.50.800 is ambiguous and, to effectuate legislative intent, the court must look to the general objective or spirit of the statute rather than any inconsistent or literal words therein, citing *Murphy v. Campbell Inv. Co.*, 79 Wn.2d 417, 420, 486 P.2d 1080 (1971) (declining to interpret "duly registered" literally); *see also State v. Day*, 96 Wn.2d 646, 647-48, 638 P.2d 546 (1981) (declining to interpret "within this state" literally).

We believe the language of RCW 3.50.800 requires construction. In addition to formal repeal of the entire section of the municipal code defining crimes, the words "repeal in its entirety" could reasonably be interpreted to mean a deliberate shift of criminal justice costs to the county, or a repeal that is effectuated functionally, on a de facto basis, rather than formally, on a de jure basis. This view is supported by Attorney General Opinion 1988 No. 9 at 7 n.6 which suggests that a "de facto" repeal could bring a city within the purview of RCW 3.50.800.[4]

---

[4]The Attorney General stated:

Depending on the facts of a particular case, a county might be able to argue that there has been a de facto repeal of municipal code provisions because the municipality's police officers have completely ceased charging violations of the provisions. If a county is able to prove that the municipality's charging practices have the same effect as an actual repeal of pertinent municipal code provisions, a court might find that the 1984 act has been violated.

Clerk's Papers at 335.

■ The authorities cited by the City for its view of RCW 3.50.800 are unpersuasive. We have never blindly applied a statute without considering the context of the statute's language or the legislative purpose. In *Public Util. Dist. 1,* we looked to the legislative purpose in addition to the ordinary meaning of the phrase at issue. *Public Util. Dist. 1,* 121 Wn.2d at 189. In *Erection Co.,* we stated that the plain and ordinary meaning should not be given to a word if a contrary intent appears in the statute. *Erection Co.,* 121 Wn.2d at 518.

Further, the proposed legislation cited by the City does not help its position. Both HB 2594 (1994) and SSB 5329 (1995) change how criminal justice system costs are handled at the local level. The City misses the point of RCW 3.50.800 and its companion provisions in the 1984 legislation. RCW 3.50.800 did not change the general responsibility of the counties to deal with criminal justice services. However, where a city has undertaken to provide criminal justice services, the city cannot precipitously quit providing such services and foist the cost on the county without attempting to discuss and address the fiscal impact of such a decision. The bills cited by the City did not amend the relevant provisions of RCW 3.50.800 and do not affect our interpretation of RCW 3.50.800.

The City's interpretation of RCW 3.50.800 results in unlikely consequences, and would make the statutory obligations illusory. A city could evade responsibility under the statute by keeping just a few crimes, or even just one crime, on its books, even if such crimes were never prosecuted, allowing the city to claim that it did not *literally* repeal in its entirety that portion of its municipal code defining crimes. Under this interpretation, a city could unilaterally escape the substantial financial obligations of the criminal justice system through a few words of clever draftsmanship.

■ A de facto repeal may be effectuated through an actual repeal of a significant portion of the municipal code

which defines crimes, a policy with respect to the charging of misdemeanors under state statutes, the exercise of discretion not to prosecute misdemeanants under a city criminal code, or some combination of such actions so that a municipal criminal code is functionally inoperative and criminal justice costs are shifted to the county.

We hold that a city's de facto repeal of that portion of its municipal code defining crimes brings a city within the purview of RCW 3.50.800. This interpretation best effectuates the legislative purpose of preventing economies in one local jurisdiction at the expense of imposing costs on the justice system in another local jurisdiction. RCW 3.50.800 forbids a "beggar thy neighbor" approach to local government fiscal policy in the criminal justice system.

## B. Issues on Summary Judgment

We next consider whether the County established that RCW 3.50.800 was satisfied in this case. The trial court here determined on summary judgment that there had been a de facto repeal by the City of that portion of its municipal criminal code defining crimes prior to July 1, 1984.

■ ■ On summary judgment, the moving party bears the burden of demonstrating an absence of any genuine issue of material fact and entitlement to judgment as a matter of law. Thereafter, the nonmoving party must set forth specific facts evidencing a genuine issue of material fact for trial. CR 56(e); *Young v. Key Pharmaceuticals, Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989). The trial court considers the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. The appellate court reviews the summary judgment de novo. *Young*, 112 Wn.2d at 226; *Mountain Park Homeowners Ass'n, Inc. v. Tydings*, 125 Wn.2d 337, 341, 883 P.2d 1383 (1994).

RCW 3.50.800 requires arbitration by a city and county if:

(a) prior to July 1, 1984, the city repealed "in its entirety" that portion of its municipal code defining crimes, but continued to hear and determine traffic infraction cases in a municipal court; and

(b) the city and county failed by January 1, 1985, to enter into an agreement under RCW 39.34 in which the city agreed to pay the county a reasonable amount for the cost associated with prosecution, adjudication, and sentencing in criminal cases filed in district court because of the repeal.

There is no dispute by the parties that (b) is satisfied here. Moreover, there is no dispute that before July 1, 1984, the City, in Ordinance 8920, repealed a significant portion of Title 10 of the Bellingham Municipal Code, that portion of the City's municipal code which defined crimes. It is also undisputed that the City continued to hear and determine traffic infractions in its municipal court after Ordinance 8920 was adopted. The only remaining factual question is the extent to which the City prosecuted any remaining crimes found in Title 10 of the Bellingham Municipal Code in the years after the adoption of Ordinance 8920 and prior to July 1, 1984.

On this precise factual point, the County alleged that the City carried only a few remaining offenses in its municipal code after 1980 for which jail was a penalty, and the City did not prosecute violators of those crimes such that they were incarcerated. The City admitted to the trial court that it had not prosecuted anyone since 1981 under the handful of crimes that remained in its municipal criminal code such that the offender was incarcerated:

THE COURT: With regard to these scattered criminal statutes if I can term them that, have there been any prosecutions under any of these ordinances in the last, say, 10 years that resulted in any jail sentences?

MR. DEJULIO: Excuse me, Your Honor.

(Off the record discussion between City's counsel.)

MR. DEJULIO: I am advised by the City Attorney of cases

in which imprisonment may have been imposed, but he has no recollection of any City misdemeanor having been sentenced to imprisonment in the county facility. I have no facts.

Supplemental Clerk's Papers at 13-14. From this fact, and the City's actual repeal of crimes in Ordinance 8920, the County contended that a de facto repeal had occurred.

While these facts certainly support a de facto repeal, the precise factual issue that confronts us is not whether the City incarcerated violators of the remaining Title 10 crimes, but whether the City prosecuted and penalized violators of the remaining Title 10 crimes between 1981 and July 1, 1984.

In connection with its motion for reconsideration, the City submitted internal budget documents setting forth its payments to the County for jail services for 1984-94. Clerk's Papers at 33-46.[5] The amounts were approximately $35,000 to $60,000 each year from 1984 through 1991, and substantially higher starting in 1992. (Apparently, the amounts paid are roughly equivalent to those paid to the County by smaller cities in Whatcom County, such as Blaine or Ferndale.) There was no evidence that for the period from 1981 to 1984 any of these budgeted amounts reflected payments for incarcerations relating to the remaining criminal offenses in Title 10 of the Bellingham Municipal Code.

██ ██ The City did not adduce evidence that it prosecuted, fined, or jailed any defendant for a violation of those few remaining crimes in Title 10 of the Bellingham Municipal Code for the period from 1981 until 1984. As the

---

[5]The record for the motion for reconsideration does indicate for 1993 and 1994 that violators of some City code provisions were incarcerated and the City paid the County for the cost of housing those prisoners in the Whatcom County Jail. The County contended that most of these individuals were incarcerated for failure to appear in connection with civil traffic infractions. The City argued that the failures to appear were for trial or arraignment on a criminal offense or failure to abide by a sentencing requirement. None of this was relevant to City actions during the crucial statutory period *before July 1, 1984*. RCW 3.50.800.

record is devoid of evidence on this key issue, the repeal of Title 10 crimes in Ordinance 8920 and the admission concerning prosecution of Title 10 crimes after 1981 loom large. The City failed to raise a genuine issue of material fact as to whether it effectuated a de facto repeal of "that portion of its municipal code defining crimes" prior to July 1, 1984, for purposes of RCW 3.50.800. The trial court properly granted the partial summary judgment.[6]

CONCLUSION

The City repealed the bulk of Title 10 in the Bellingham Municipal Code pertaining to crimes in 1980. City officers were instructed to charge misdemeanors under state law. The City provided no evidence that it prosecuted, fined, or jailed an offender under any of the remaining crimes in Title 10 of its Code for the period from 1981 to 1984. The City closed its jail.

RCW 3.50.800 forbids an actual or de facto repeal by a city of that portion of its municipal code defining crimes prior to July 1, 1984, without the city and county together addressing the fiscal consequences of such a decision. The Legislature clearly intended to prevent a city from achieving a budgetary benefit by imposing the burden of criminal code enforcement on a county. That is what Bellingham did to Whatcom County in 1980. Bellingham must now arbitrate with Whatcom County the fiscal impact of its decision.

---

[6]The City makes two other arguments that are without merit. First, the City argues the County is estopped to seek reimbursement for criminal justice costs because the 1981 settlement agreement resulted in full compensation to the County for the City's actions. The settlement agreement provided that the settlement would not be final if state law changed, requiring cities to reimburse counties for such costs. RCW 3.50.800 was obviously such a change. Any payments made by the City to the County pursuant to the settlement agreement are offsets in the arbitration.

Second, the City suggests that the County seeks equitable relief under RCW 3.50.800 and such relief is barred by the doctrine of laches. The City provides no authority for the view that an action under RCW 3.50.800 is equitable in nature and does not discuss the elements of laches under the facts here. *See, e.g., Davidson v. State*, 116 Wn.2d 13, 26, 802 P.2d 1374 (1991). Accordingly, we decline to address this issue. *In re F.D. Processing, Inc.*, 119 Wn.2d 452, 455-56, 832 P.2d 1303 (1992).

We affirm the partial summary judgment in favor of the County and remand the case for arbitration in accordance with the provisions of RCW 3.50.800.

DURHAM, C.J., DOLLIVER, SMITH, GUY, JOHNSON, MADSEN, and ALEXANDER, JJ., and PEKELIS, J. Pro Tem., concur.